UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GEORGE DELORENZO,

        Plaintiff,

vs.                                                Case No. 8:03-CV-2097-T-27MSS

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

        Defendant.
_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

**BEFORE THE COURT** are Defendant's Motion for Summary Judgment (Dkt. 14), Plaintiff's Motion for Summary Judgment (Dkt. 17), and Defendant's Memorandum of Law in Opposition to Plaintiff's Dispositive Motion for Summary Judgment (Dkt.18). The parties have stipulated that the case should be resolved on these motions because there are no disputed issues of material fact. (*See* Dkt. 20, Dkt. 18 at p. 1). Upon consideration, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED**.

### I. Introduction

George DeLorenzo ("Plaintiff") sued Hartford Life and Accident Insurance Company ("Defendant") alleging that Defendant wrongfully terminated his long term disability ("LTD") benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). (Dkt. 1).

### II. Factual Background

Through 1993, Plaintiff worked for Consolidated Supermarkets as Director of Operations.

(A.R. H. 226, 861). Plaintiff last worked on December 10, 1993, after fracturing his left wrist and undergoing surgery. (A.R. H. 226, 824-835, Dkt. 14 at ¶9, Dkt. 17 at ¶4). Subsequently, Wakefern Corporation acquired Consolidated Supermarkets. (A.R. H. 226, 861). Plaintiff was a participant in a Wakefern Corporation ERISA benefit plan, policy number GLT-204771, funded by a group insurance policy issued by Hartford Life ("the Plan"). (Dkt. 14 at ¶1, Dkt. 17 at ¶1).

Plaintiff applied for LTD benefits in 1994. (Dkt. 14 at ¶10, Dkt. 17 at ¶5). Defendant approved Plaintiff's claim and paid Plaintiff LTD benefits under the Plan from 1994 through August 7, 2002. (A.R. H. 225, 854, Dkt. 14 at ¶10, Dkt. 17 at ¶5).

## A. Medical Records

In 1994, Plaintiff underwent arthroscopic surgery on his shoulder after he began experiencing shoulder, neck and low back pain. (A.R. H. 227, Dkt. 14 at ¶9, Dkt. 17 at ¶4). Plaintiff subsequently developed symptoms of carpal tunnel syndrome ("CTS"). (A.R. H. 254, Dkt. 14 at ¶11, Dkt. 17 at ¶6). Medical tests showed evidence of various spine and neck ailments, including radiculopathy, cervical spondylosis, myelopathy and disc herniation. (Dkt. 14 at ¶11, Dkt. 17 at ¶6). Plaintiff was also diagnosed with bilateral severe knee arthritis. (A.R. H. 231).

Dr. Jungreis, a neurologist, treated Plaintiff for several years. In 1996, Dr. Jungreis opined that Plaintiff could not work at any level. (A.R. H. 447). In 1998, however, Dr. Jungreis told a medical reviewer that Plaintiff had sedentary work capacity. (A.R. H. 47, 55, 912). Two months later, Dr. Jungreis noted that Plaintiff was tolerating his current combination of medications "without difficulty" and was ready to start volunteering. (A.R. H. 427). Dr. Jungreis "strongly advised" Plaintiff to get into "some type of volunteer work." However, four months later, on June 30, 1999, Dr. Jungreis again opined on an Attending Physician Statement that Plaintiff was unable to work and

disabled. (A.R. H. 554, 912).

Plaintiff was involved in a motor vehicle accident in July, 1999. (A.R. H. 917). An April 2000 office note indicates that Plaintiff attended an amusement park several days earlier. (A.R. H. 918). In March 2001, Dr. Jungreis opined that Plaintiff was "o.k." to stand, walk, sit, or lift but was "weak" with regards to reaching, pushing, pulling and driving. (A.R. H. 519). In October 2001, Plaintiff contacted Defendant to explore whether his benefits would be impacted by taking a part time job at a golf course. (A.R. H. 43). However, three days later, Dr. Jungreis opined that Plaintiff was "basically unable to carry out any type of normal activity." (A.R. H. 463). In December 2001, Plaintiff told Dr. Jungreis that "any type of driving aggravates the pain and paresthesias." (A.R. H. 462). However, video surveillance shows Plaintiff driving over 25 miles to a golf club and restaurant on January 23, 2002, approximately 35 miles to a mall and dog track on February 19, 2002, and over 22 miles to a grocery store and dog track on February 20, 2002. (A.R. H. 279-283, 286, 290-298).

Dr. Kallins, a specialist in physical medicine and rehabilitation, examined Plaintiff in April 2002. (A.R. H. 422-424). Dr. Kallins noted that Plaintiff's medications included Neurontin, Percocet and Valium and found that Plaintiff was "somewhat disinhibited, but overall appropriate, oriented and communicates effectively." Plaintiff's strength, sensation and hand function were normal, his range of motion was full and he walked normally.

Dr. Mercer, a physician with the University Disability Consortium ("UDC"), an independent group of physicians specializing in disability evaluation, performed a review of Plaintiff's medical records and issued a July 2002 report concluding that Plaintiff was capable of performing full-time

sedentary Department of Labor ("DOL") category work[1] with restrictions as a result of his cervical spondylosis with spinal stenosis. (A.R. H. 261-262). On July 22, 2002, Dr. Mercer spoke with both Dr. Jungreis and Dr. Marciales, a physician specializing in internal medicine and Plaintiff's primary care physician. (A.R. H. 259). Both treating physicians opined that Plaintiff could not work. (A.R. H. 166, 226, 228).

Dr. Marciales wrote a letter to Dr. Mercer placing certain physical restrictions on Plaintiff and opining that Plaintiff was not able to maintain full time employment due to his "pain, his inability to lift, and inability to bend." (A.R. H. 189-190). Dr. Marciales opined that "[m]ost of his limitations are related to pain in the knees." (A.R. H. 189). Dr. Marciales also noted that Plaintiff's activities were minimal, including staying at home and watching TV. (A.R. H. 190). In addition to driving, the surveillance video from January and February, 2002 captures Plaintiff being active for up to five hours consecutively at the dog track, sitting, intermittently getting up, standing, walking short distances, concentrating on T.V. monitors, intermittently placing bets, smoking, drinking beer, socializing with another patron and generally moving around without any apparent pain.[2] (A.R. H. 94, 261).

Dr. Mercer placed emphasis on this video surveillance and on Dr. Kallins' medical records rather than on the opinions of Drs. Marciales and Jungreis. (A.R. H. 262). Dr. Mercer contrasted

---

[1] The DOL's Dictionary of Occupational Titles defines sedentary work as requiring "exertion of up to 10 pounds of force occasionally ... and/or a negligble amount of force frequently ... to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." *Hass v. Barnhart*, 91 Fed. Appx. 942, 944 n. 1 (5th Cir. 2004); *see Richards v. Hartford Life & Accident Insur. Co.*, 153 Fed. Appx. 694, 697 (11th Cir. 2005).

[2] The Court has independently reviewed the video surveillance submitted by Defendant.

Dr. Jungreis' findings of weakness in the left upper extremity with Dr. Kallins' findings. (A.R. H. 260). Dr. Mercer also noted that his review of the medical records reflected Plaintiff riding a wave-runner, attending a theme park and planning a trip to the Bahamas. (A.R. H. 256-257, 262). Dr. Mercer noted that Plaintiff was taking Remeron, Percocet, Valium, Neurontin and Methadone in late 2001. (A.R. H. 256).

On August 8, 2002, Defendant issued a letter to Plaintiff terminating his LTD benefits. (A.R. H. 225-230). Based on Dr. Mercer's finding of sedentary work capability, Defendant found five occupations that Plaintiff could perform which were prevalent in the national economy. (A.R. H. 231-233). Each of these occupations are described as involving "[m]ostly sitting, may involve standing or walking for brief periods of time." (A.R. H. 109, 111, 113, 115, 117). Defendant's denial letter noted that despite Dr. Marciales' and Dr. Jungreis' opinions that Plaintiff was not capable of work, Dr. Marciales was not aware of Plaintiff's level of activity demonstrated by the video surveillance and Dr. Jungreis opined in 2001 that Plaintiff was "o.k." to stand, walk, sit, or lift. (A.R. H. 228, 519).

In August 2002, Plaintiff appealed the termination of his benefits. (A.R. H. 216-217). On October 1, 2002, Defendant notified Plaintiff that it was considering his appeal, that the decision would not be rendered during the initial 45 day period and that a decision "should be made prior to November 24, 2002." (A.R. H. 199). Defendant arranged for another physician with the UDC, Dr. King, to perform a second review of Plaintiff's file. (A.R. H. 155-172).

Dr. King opined in a November 2002 letter that Plaintiff could stand or walk up to 6 hours in an 8 hour day, sit for 8 hours in an 8 hour day and perform full-time work at a sedentary or light level. (A.R. H. 171). Dr. King also found that "[t]here is no indication in the records reviewed that

5

medications are significantly affecting functionality." (A.R. H. 171). Besides reviewing the medical records, Dr. King spoke with Dr. Martin, Dr. Marciales and Dr. Esparza. Dr. Marciales again opined that there had been no improvement in Plaintiff's condition and that he could not work. (A.R. H. 149-150). Dr. King, however, noted that Dr. Marciales is not a neurologist and seemed to be strongly influenced by one acute episode experienced by Plaintiff. (A.R. H. 168). Dr. Martin, a neurosurgeon who consulted with Plaintiff during a hospitalization, opined that Plaintiff would eventually become quadriplegic without surgery, was impaired, needed surgery and was unable to work. (A.R. H. 147-148, 162-164, 167). Dr. King noted that Dr. Martin's examination of Plaintiff never demonstrated anything other than mild myelopathic findings. (A.R. H. 168). Dr. King opined that the need for surgery should not be interpreted as evidence of severe functional impairment. (A.R. H. 172). Neither Dr. Marciales or Dr. Martin were questioned about the video surveillance or Dr. Esparza's findings. (A.R. H. 167).

Dr. King appears to have relied heavily on the determinations made by Dr. Esparza, a neurologist who examined Plaintiff at the request of Dr. Martin, and the video surveillance. Dr. King noted that the video surveillance captured Plaintiff walking back and forth from the betting machines every ten minutes for a period of three hours. (A.R. H. 170). Dr. Esparza examined Plaintiff in October 2002, and his exam demonstrated no weakness or pathological reflexes consistent with symptomatic myelopathy. (A.R. H. 167). He believed that Plaintiff could walk or stand for 6-8 hours in an 8 hour work day and had no limitations on sitting. (A.R. H. 167-168). Dr. Esparza also noted that Plaintiff's biggest problem was his subjective complaints of pain and balance difficulties and that he had a disability rating of only 10%. (A.R. H. 152). He noted that Plaintiff's current medications included Neurontin, Percocet, Effexor and Valium. (A.R. H. 182).

Nevertheless, upon examination, Dr. Esparza found Plaintiff to be "alert, fully oriented." He also found Plaintiff's speech to be fluent and goal-directed and his thoughts to be organized. Dr. King determined that Dr. Esparza's examination revealed "normal mental status testing." (A.R. H. 164).

Defendant arranged for a neurologist, Dr. Aung-Din, to perform an independent medical examination ("IME") on Plaintiff in January 2003. (A.R. H. 143, 104-105). Dr. Aung-Din found that Plaintiff was "awake, alert, slightly slow to respond, oriented and appropriate, no neglect or apraxia, no delusional thought processes or psychosis." (A.R. H. 104). Dr. Aung-Din opined, "I feel this gentleman is disabled of at least as part of his chronic pain syndrome." Dr. Aung-Din noted that further examination would be helpful in determining the emotional and psychological components "of this question." Dr. Aung-Din opined that Plaintiff had certain physical restrictions and stated:

> As far as additional comments, I feel that the above factors are primarily on the basis of physical capacities, but that his being on strong narcotic medications as well as sedating muscle relaxants could further impair his judgment as well as functionality and needs to be taken in consideration. I feel the above restrictions are pertinent so long as he remains on the present medical regimen. However, should he go through a rehabilitation program for his narcotic dependency, these could be lifted. If he has definitive surgery for his cervical, spinal degenerative disease, these could also be lifted or improved. As far as the patient reaching maximum medical improvement, I feel he is at that state barring surgical intervention but that in regards to the question of narcotic dependency, this could be dealt [sic] through rehabilitation program and discontinued and he could further be improved. I feel that he could work in his prior occupation with some restrictions as a temporary trial. Certainly, from his description, this is quite vigorous in regards to driving and walking, and I feel he could return to lighter duty capacity immediately, if not restricted by his narcotic use.
> (A.R. H. 105).

Defendant subsequently requested that Dr. Aung-Din address the video surveillance and how Plaintiff's medications would affect his performance in a sedentary occupation. (A.R. H. 130, 132).

Dr. Aung-Din submitted a second letter stating:

> Accordingly, as indicated in my initial report, I feel he is able to return to his prior

7

occupation with the noted lifting restrictions. In regards to how his chronic narcotic dependency would affect his functioning at work, this would primarily affect mental acuity and alertness, which could interfere with judgment and operation of machinery including, long distance driving." (A.R. H. 101).

Dr. Aung-Din also filled out a physical capacities form in which he wrote "yes" next to "date patient can return to work at his/her regular occupation." (A.R. H. 107).

On March 6, 2003, Defendant denied Plaintiff's appeal. (A.R. H. 91-98).

### B. Plan Provisions

The Plan provides that:

Totally Disabled means that:
(a) during the Elimination Period; and
(b) for the next 24 months, you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis. After that, and for as long as you remain Totally Disabled, *you are prevented by Disability from doing any occupation or work for which you are or could become qualified by training, education, or experience.* (A.R. H. 70)(emphasis added).

With respect to Plaintiff, the "any occupation or work" provision became effective on February 11, 1996. (A.R. H. 253, 854). The Plan also provides that:

The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy. (A.R. H. 69)

The Hartford will cease benefit payment on the first to occur of:
(1) the date you are no longer Disabled:
(2) the date you fail to furnish proof that you are continually Disabled;
(3) the date you refuse to be examined, if The Hartford requires an examination;
(4) the date you die; or
(5) the date determined from the table below. (A.R. H. 80)(age payable chart omitted).

### III. STANDARD OF REVIEW

ERISA does not provide a standard to review decisions of a plan administrator or fiduciary

for actions challenging benefit determinations under § 1132(a)(1)(B). *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989); *Paramore v. Delta Air Lines*, 129 F.3d 1446, 1449 (11th Cir. 1997). The Supreme Court has established that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bruch*, 489 U.S. at 115.

Consistent with the Court's directive in *Bruch*, the Eleventh Circuit has adopted three standards of review for plan interpretations: (1) *de novo*, applicable where the plan administrator is not afforded discretion; (2) arbitrary and capricious, when the plan grants the administrator discretion; and (3) heightened arbitrary and capricious, when there is a conflict of interest because the same company both funds the plan and administers claims. *Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir. 1997) (citations omitted).

Before considering which standard to apply, however, the court first reviews the administrative record *de novo* "to determine whether the claim administrator's benefits-denial decision is 'wrong' (*i.e.* the court disagrees with the administrator's decision)." *Williams v. Bellsouth Telecommunications, Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004). If the court does not disagree with the administrator, then the inquiry ends. *Id.* If the court disagrees with the administrator, then it proceeds to evaluate the decision in light of the arbitrary and capricious review applied when discretion has been afforded the administrator or the heightened arbitrary and capricious review when there is a conflict of interest.

## IV. DISCUSSION

Here, the operative inquiry is whether Plaintiff was disabled within the meaning of the Plan's

language as of the date Defendant terminated his benefits. Under the relevant provisions of the Plan, Plaintiff was not eligible to continue to receive disability benefits unless he was prevented by his disability "from doing any occupation or work" for which he was or could become "qualified by training, education, or experience." (A.R. H. 70). Defendant terminated Plaintiff's benefits because it concluded that Plaintiff could not continue to establish through medical records that he was prevented from doing any occupation or work. After a *de novo* review of the administrative record, this Court concludes that Defendant's decision to terminate benefits was not wrong.

### A. The Decision to Terminate Plaintiff's Benefits Under the Plan Provisions Was Not "Wrong"

Defendant contends that it was entirely appropriate for it to find that Plaintiff was not precluded from performing "any occupation" under the policy based on the reports of the two reviewing physicians, Drs. Mercer and King, the IME performed by Dr. Aung-Din, the video surveillance of Plaintiff and the employability analysis. Defendant argues that although Plaintiff's treating physicians opined that Plaintiff was unable to work, they did so in a conclusory fashion with few specific physical restrictions and, at times, placed physical restrictions on Plaintiff that were actually consistent with the ability to perform sedentary work. Defendant also argues that the two most recent examinations of Plaintiff, performed by Drs. Aung-Din and Esparza, support its finding that Plaintiff is capable of working.

Plaintiff does not take issue with Defendant's determination that Plaintiff is capable of physically performing the demands of sedentary work. The video surveillance obtained by Defendant shows Plaintiff driving, bending over to place groceries into his sports car, sitting for extended periods of time at a bar in a dog track, socializing with another patron, smoking, drinking

10

and walking back and forth to use a betting machine. Rather, Plaintiff essentially argues that he has met his burden of proving a continued disability and that Defendant failed to take into account the effect of Plaintiff's pain and narcotic medications when determining that Plaintiff is capable of performing sedentary work and no longer entitled to disability benefits. Plaintiff claims that his pain and narcotic use was not addressed by the two physicians Defendant relied on in making its denial determination, Drs. Mercer and King. Defendant responds that an individual can experience pain and take medications yet still retain the ability to work.

This case is not one that involves a lack of objective medical evidence. A review of the medical records reveals objective medical findings of radiculopathy, cervical spondylosis with cervical spinal stenosis, myelopathy and disc herniation. (A.R. H. 259). However, a diagnosis "does not by itself establish disability." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2003). The question initially addressed by the Plan administrator and addressed by the Court in its *de novo* review is whether Plaintiff met his burden of establishing entitlement to continued disability benefits due to his inability to perform "any occupation." *See Horton v. Reliance Standard Life Ins. Co*, 141 F.3d 1038, 1040 (11th Cir. 1998)(stating that a plaintiff suing under section 1132(a)(1)(B) "bears the burden of proving his entitlement to contractual benefits").

While Plaintiff argues that "[t]he uncontroverted evidence, however, shows that Mr. DeLorenzo is restricted not only by his pain but buy [sic] his narcotic use as prescribed and approved by all of his doctors," Plaintiff fails to cite to any medical records, other than Dr. Aung-Din's reports, to support his contention that his medications prevent him from working. (*See* Dkt. 17 at p. 26). Moreover, Dr. King, the second reviewing physician, expressly found that there were no medical

11

records to support a finding that Plaintiff's medications were affecting his functionality. *See Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004) (upholding termination of benefits where reports from plaintiff's treating doctors did not support plaintiff's claim that her medications limited her ability to work). Plaintiff has failed to carry his burden of establishing a continued disability. Upon review of the record in its entirety, only one physician's records even arguably support Plaintiff's position with respect to his medications. Dr. Aung-Din's opinion could be read to support Plaintiff's position. Dr. Aung-Din concluded that Plaintiff was disabled "of at least as part of his chronic pain syndrome," but recommended further examination. He opined that Plaintiff's being on strong narcotic medications "could" impair his judgment and functionality. Dr. Aung-Din also recommended a rehabilitation program to deal with Plaintiff's narcotic dependency. He opined that Plaintiff could return to lighter duty work "if not restricted by his narcotic use." In his final letter, Dr. Aung-Din stated that Plaintiff's narcotic dependency "would primarily affect mental acuity and alertness, which could interfere with judgment and operation of machinery including long distance driving."

Dr. Aung-Din's opinion on Plaintiff's ability to work is somewhat ambiguous, if not contradictory. Accordingly, both parties have cited Dr. Aung-Din in support of their respective positions. Dr. Aung-Din had apparently just reviewed the video surveillance showing Plaintiff driving without apparent difficulty between 22-35 miles at a time before opining that Plaintiff's narcotic dependency could interfere with driving. Dr. Aung-Din also found Plaintiff to be "alert" upon examination despite opining that the narcotics would affect mental alertness. More importantly, he opined in his first letter that Plaintiff could work in his prior occupation "with some restrictions as a temporary trial." After reviewing the video surveillance, he opined that Plaintiff

"is able to return to his prior occupation with the noted lifting restrictions."

Contradicting any suggestion in Dr. Aung-Din's records that Plaintiff's medications impair his judgment or ability to operate machinery is the video surveillance, the opinions of reviewing physicians Drs. Mercer and King, and the medical records of examining physicians, Drs. Kallins and Esparza. Plaintiff argues that he should not be forced to "dope himself up with medications, get in his car, contrary to medical advice, drive himself to find a job and if he finds one, work while under the influence of a combination of very potent narcotic drugs and sedating muscle relaxants." (Dkt. 17 at p. 27). As discussed above, however, the video surveillance shows Plaintiff driving without difficulty to and from a grocery store and dog track on more than one occasion. Accordingly, Plaintiff's argument that the video surveillance does not reflect the side effects of Plaintiff's narcotic medication is disingenuous in that it depicts Plaintiff driving, the very activity that he argues he cannot perform. With respect to Plaintiff's ability to function despite his medications, in addition to driving a vehicle, the video surveillance depicts Plaintiff placing bets, concentrating on television monitors displaying races and interacting with another patron. It shows Plaintiff retained sufficient faculties to engage in such activities. Likewise, Plaintiff's argument that the video does not reflect "the pain DeLorenzo was suffering during the entire five (5) and subsequent four (4) hour period" of surveillance is unavailing. (Dkt. 17 at p. 8). Plaintiff does not appear to be in any pain in the surveillance but, rather, appears to move in his chair at the dog track without difficulty and bend over to place groceries into his sports car without wincing. Reliance on video surveillance documenting a plaintiff's functional capabilities is entirely appropriate under ERISA. *See Turner v. Delta Family-Care Disability and Survivorship Plan*, 291 F.3d 1270, 1274 (11th Cir. 2002).

Dr. Mercer, the first reviewing physician, acknowledged both Plaintiff's complaints of pain

13

and Plaintiff's medications yet determined that Plaintiff could work. Plaintiff is correct that Dr. Mercer did not discuss what effect, if any, Plaintiff's narcotic medications would have on his ability to work or function. Dr. Mercer was, however, aware of the medications Plaintiff was taking, as evidenced by his report. Although Plaintiff argues that Dr. Mercer did not include the dosage or frequency of those medications in his report, he cited to Dr. Jungreis' medical records which refer to the dosage of medications. (A.R. H. 462-463). Dr. Mercer also acknowledged Plaintiff's complaints of low back, cervical, left wrist, left hip, leg, neck and knee pain in his medical review. (A.R. H. 254-258).

Dr. King, the second reviewing physician on whom Defendant relied in ultimately rejecting Plaintiff's appeal, expressly noted that there were no medical records to support a finding that Plaintiff's medications were affecting his functionality. As his report is dated prior to the report of Dr. Aung-Din, his conclusion confirms that no other physicians opined that Plaintiff's medications prevented him from working. In contrast, examining physician Dr. Kallins expressly noted in April 2002 that Plaintiff's medications included Neurontin, Percocet and Valium yet found that Plaintiff was "overall appropriate, oriented and communicates effectively" upon examination. (A.R. H. 422-24). Similarly, in October 2002, examining physician Dr. Esparza found Plaintiff to be "alert, fully oriented" with fluent and goal-directed speech and organized thoughts. (A.R. H. 182). Dr. King also acknowledged Plaintiff's complaints of neck, wrist, hand and left hip pain. (A.R. H. 157-161). Nevertheless, Dr. King opined that Plaintiff was able to work.

Plaintiff's argument that Defendant was not entitled to rely on the opinions of the reviewing physicians because they did not examine Plaintiff is easily disposed of. The Supreme Court has determined that courts may not apply a "treating physician rule" to employee benefit claims made

under ERISA. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). In other words, courts cannot require plan administrators to automatically afford greater weight to the opinion of a physician simply because he treated the plaintiff. *Id.* at 835. Similarly, courts cannot impose upon plan administrators a burden of explaining why reliable evidence was credited over opinions of a treating physician. *Id.* Therefore, it is appropriate to rely on the opinions of Drs. Mercer and King, Defendant's reviewing physicians, over Plaintiff's treating physicians.

Finally, treating physician Dr. Jungreis' opinion does not directly support Plaintiff's argument. Dr. Jungreis apparently vacillated as to whether Plaintiff was capable of performing any work. His most recent opinion was that Plaintiff had no limitations with respect to standing, walking, sitting or lifting. Further, he never opined that Plaintiff's medications specifically prevented Plaintiff from working.

The Court finds that Defendant's decision to terminate Plaintiff's LTD benefits was not wrong. Accordingly, the Court need not address Plaintiff's argument that the heightened arbitrary and capricious standard applies due to Defendant's conflicted position as a result of funding and administering the plan.

### B. Plaintiff's Procedural Argument

Plaintiff also claims that Defendant committed two procedural violations. Plaintiff does not state what relief he believes he is entitled to as a result of these procedural violations. First, Plaintiff claims that Defendant failed to notify Plaintiff of additional materials needed to perfect Plaintiff's claim pursuant to 29 C.F.R. § 2560.503-1(f)(3) in Defendant's August 8, 2002, letter notifying Plaintiff that he no longer met the requirements for LTD benefits. Plaintiff claims that it is clear that Defendant needed additional information because Defendant hired two additional doctors, Dr. King

and Dr. Aung-Din, to evaluate Plaintiff's records and examine Plaintiff after Plaintiff submitted his appeal. Defendant responds that the cited regulation is inapplicable because Defendant did not need any additional information from Plaintiff in order for Plaintiff to perfect his disability claim.

29 U.S.C. § 2560.503-1(f)(3)(1994)[3] provides, in part, that the notification of any adverse benefit determination shall set forth:

> [a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary.

The regulations also require that the claim denial letter set forth the specific reason or reasons for the denial, reference the pertinent plan provisions, and describe the plans' review procedures in the event a beneficiary wishes to submit his or her claim for review. *Id.* "These requirements insure that when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his case." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992). A notice which "substantially complies" with the requirements is sufficient. *Bojorquez v. E.F. Johnson Co.*, 315 F. Supp. 2d 1368, 1373 (S.D. Fla. 2004)(citing *Counts v. American General Life and Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997)); *Halpin*, 962 F.2d at 690. The proper inquiry in determining substantial compliance is whether the notice provided enough information for Plaintiff to understand the administrator's position such that any appeal would be effective. *Ellis v. Metropolitan Life Insur. Co.*, 126 F.3d 228, 236 (4th Cir. 1997)(citing *Brogan v. Holland,* 105 F.3d 158, 165 (4th Cir. 1997)).

Here, Defendant's letter substantially complied with the regulations. The August 8, 2002

---

[3] In 2001, the cited provision was moved to 29 C.F.R. § 2560.503-1(g)(iii). This section contains the same language.

letter cites to the section of the plan defining Total Disability, lists specific documents relied on in making the determination, states the reasoning behind the decision, notifies Plaintiff of his right to appeal and states that "[a]long with your appeal letter, you may submit written comments, documents, records and other information related to your claim." (A.R. H. 229). The letter indicates that Defendant found, based on the medical evidence, surveillance video, the independent review by Dr. Mercer and personal statements by Plaintiff, that Plaintiff retained the ability to perform sedentary full-time work with specific restrictions. (A.R. H. 228). Specifically, the letter notified Plaintiff that the medical review by Dr. Mercer focused on the video surveillance of Plaintiff, depicting him as active for five consecutive hours at the dog track, and the medical records of Dr. Kallins, who found normal strength, sensation and hand function and full range of motion. (A.R. H. 228).

A review of the denial letter in its entirety reveals that Plaintiff was on notice that he was being denied benefits based on a determination that he retained the ability to perform sedentary work with specific limitations. Any documents that he wished to submit on appeal would have had to address this finding in the denial letter. *See Bojorquez*, 315 F. Supp. 2d at 1373-74 (finding inclusion of statement, "if you have new, additional information to support your request for disability benefits, please send it to my attention at the address noted on this letterhead," constituted substantial compliance with regulation where the letter clearly set forth the reasoning behind the administrator's decision); *see also Ellis*, 126 F.3d at 235-36 (finding substantial compliance where denial letter explained reason for denial, quoted relevant plan language, informed plaintiff of her right to request further review and stated, "[w]hen requesting this review, you should state the reason you believe the claim was improperly denied and you may submit any data, questions or comments to

Metropolitan you deem appropriate").

While at least one court has awarded reinstatement of benefits where the failure to comply with the notice regulations was egregious, this case does not involve any egregious notice procedural errors. *See Halpin*, 962 F.2d at 697 (finding statement that plaintiff "should include any facts or pertinent information you consider important" was insufficient where "significant procedural deficiencies occurred," including a failure to give reasons for denial and a failure to obtain a vocational specialist).[4] The denial letter sufficiently explained Defendant's reasons for terminating Plaintiff's benefits and Plaintiff was thereby on notice of what type of information to submit if he so desired. Accordingly, Defendant substantially complied with the notice requirements of 29 C.F.R. § 2560.503-1(g)(iii).

Next, Plaintiff claims that Defendant failed to render a decision within the required 60 or 120 days pursuant to 29 C.F.R. § 2560.503-1(h). Defendant agrees that its review of Plaintiff's appeal exceeded the time permitted by the applicable regulation. Defendant rendered its decision in March 2003 rather than November 2002, the date it assured Plaintiff it would render a decision following the initial extension of time. Defendant also concedes that some courts have denied the right to an arbitrary and capricious standard of review due to the administrator's failure to decide a claim within the regulatory time frame. However, Defendant argues that Plaintiff is not entitled to an award of benefits based on such a procedural violation.

Even if Plaintiff convinced the Court to apply the *de novo* standard of review as a result of

---

[4] Plaintiff's reliance on *Hertzberger v. Standard Ins. Co.*, 205 F.3d 327 (7th Cir. 2000) is also unavailing. In *Hertzberger,* the main focus of the decision was the determination that the proper standard of review to apply was *de novo*, rather than arbitrary and capricious, where two consolidated appeals involved plans that did not specifically state that the plan administrator had discretion in making disability determinations. *Id.* at 332-333. In the final paragraph of the decision, the Court noted that on remand the court should consider whether the defendant's denial letters were sufficiently specific under 29 C.F.R. § 2560.503-1(f)(3). *Id.* at 333. The court performed no analysis, however, regarding the sufficiency of the notice.

Defendant's procedural violation, the Court has already found that Defendant's decision was not wrong under a *de novo* review. Accordingly, it is unnecessary to further address this procedural violation. *See Torres v. Pittston Co.*, 346 F.3d 1324, 1333 (11th Cir. 2003); *see also Seger v. ReliaStar Life*, 2005 WL 2249905, *7 (N.D. Fla. Sept. 14, 2005); *Hamall-Desai v. Fortis Benefits Ins. Co.*, 370 F. Supp. 2d 1283, 1291-93 (N.D. Ga. 2004), *aff'd*, 2006 WL 263643 (11th Cir. Feb. 2, 2006); *Nichols v. The Prudential Insurance Co. of America*, 406 F.3d 98, 109 (2d Cir. 2005).

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that:

1. Defendant's Motion for Summary Judgment (Dkt. 14) is **GRANTED**;
2. Plaintiff's Motion for Summary Judgment (Dkt. 17) is **DENIED**;
3. The Clerk is directed to enter Judgment in favor of Defendant and against Plaintiff and close this case.

**DONE AND ORDERED** in chambers this 27th day of February, 2006.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record